# EXHIBIT R

# JACOBS DECLARATION

# EXHIBIT P

# (REDACTED)

# EXHIBIT D

[DOCUMENT SOUGHT TO BE SEALED]

Case 2:18-cv-00550-JRG-RSP Document 29-23 Filed 07/01/19 Page 4 of 8 PageID #: 816
Case 3:18-cv-00360-WHA Document 163-18 Filed 02/15/19 Page 3 of 9

CONFIDENTIAL - Attorneys' Eyes Only

```
 1                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

 2                   SAN FRANCISCO DIVISION

 3

 4   UNILOC USA, INC., et al.,   Case Nos.: 3:18-cv-00360-WHA
                                 Case Nos.: 3:18-cv-00363-WHA
 5            Plaintiffs,        Case Nos.: 3:18-cv-00365-WHA
                                 Case Nos.: 3:18-cv-00572-WHA
 6   vs.

 7   APPLE INC.,

 8            Defendant.
     _____//

 9

10

11        CONFIDENTIAL - ATTORNEYS' EYES ONLY

12             DEPOSITION OF EREZ LEVY

13            Friday, September 21, 2018

14

15

16   REPORTED BY:

17   APRIL DAWN HEVEROH, RPR, CLR, CCRR, CSR No. 8759

18

19

20

21

22

23

24

25
```

Page 65

1     A. I am not aware.
2     Q. Did you take any steps to verify any amendments
3 that may have happened prior to May 3rd, 2018?
4     A. Not specifically to the patent license
5 agreement.
6     Q. If you go with me still on the first page, near
7 the bottom do you see it reads, "Whereas, in
8 consideration of the investments set forth in the
9 purchase agreement, licensor agreed to certain rights,
10 including rights to license patents and patents
11 applications, to the licensee for the benefit of the
12 secured parties"?
13     A. I see that paragraph.
14     Q. Those patents are listed in schedule I(a) of
15 the purchase agreement as updated from time to time?
16     A. Is that a question?
17     Q. Yes.
18     A. I don't know.
19     Q. If you read the next paragraph it begins,
20 "Whereas, licensor is the owner of certain patents and
21 patent applications identified in schedule I(a) of the
22 purchase agreement as updated from time to time." Did I
23 read that correctly?
24     A. You did read it correctly.
25     Q. Did the parties intend for all patents owned by

Page 66

1 Uniloc Luxembourg and Uniloc USA to be part of this
2 license to Fortress Credit?
3     A. I do not recall.
4     Q. Are you aware of any patents that were excluded
5 from this license?
6     A. I do not recall.
7     Q. Did you take any steps to verify whether the
8 parties intended for all patents owned by Uniloc
9 Luxembourg to be part of this license to Fortress
10 Credit?
11     A. In preparation for this deposition?
12     Q. Or in general.
13     A. No.
14     Q. Did you take any steps to determine whether any
15 particular patents were excluded from this license
16 between Fortress and Uniloc?
17     A. No.
18     Q. Nevertheless, sitting here today, you're not
19 aware of any patents that were excluded from this
20 license, correct?
21     A. That is correct.
22     Q. To the best of your understanding, this
23 agreement was intended to include all of Uniloc
24 Luxembourg's patent portfolio, correct?
25     A. Yes.

Page 67

1     Q. And to the best of your understanding, this
2 agreement was intended to include the patents that
3 Uniloc Luxembourg later acquired from Hewlett Packard,
4 right?
5     A. Yes.
6        (Whereupon, Defendant's Exhibit 1012 was marked
7         for identification.)
8 BY MS. NEFF:
9     Q. I have marked as an exhibit the revenue sharing
10 and note and warrant purchase agreement as amended.
11 Mr. Levy, do you see that this revenue sharing and note
12 and warrant purchase agreement was entered into on
13 December 30th, 2014?
14     A. I do.
15     Q. And there were three amendments to this revenue
16 sharing agreement: One on February 24th, 2015, one on
17 May 27th, 2016, and one on May 15th, 2017, correct?
18     A. Yes.
19     Q. Why was the revenue sharing agreement between
20 Uniloc and Fortress amended on February 24th, 2015?
21     A. Sorry. Repeat the question and the dates.
22     Q. Why was the revenue sharing agreement between
23 Uniloc and Fortress amended on February 24th, 2015?
24     A. We decided to fund more money into the company.
25     Q. Why was the revenue sharing agreement between

Page 68

1 Uniloc and Fortress amended on May 26th, 2016?
2     A. We decided that we would like to invest more
3 money in the company.
4     Q. Why was the revenue sharing agreement between
5 Uniloc and Fortress amended on May 15th, 2017?
6     A. That was part of the financing -- the last
7 financing we did in May 2000 -- sorry. That's '17 --
8 yeah, part of the last financing we did as part of the
9 three transactions we did for them.
10     Q. As part of the transactions that you did before
11 the May 2018 asset purchase agreement, right?
12     A. Yes. Thank you.
13     Q. How did any of the amendments to this revenue
14 sharing agreement change Fortress' security interest in
15 the patent portfolio of the Uniloc entities listed on
16 this page?
17     A. Can you repeat that question. Sorry.
18     Q. I'll ask a better question.
19     A. Yeah.
20     Q. You testified that over time, Fortress decided
21 to invest more money in Uniloc, correct?
22     A. Correct.
23     Q. And over time, Fortress amended -- withdrawn.
24        Over time Fortress and Uniloc amended this
25 revenue sharing agreement at times that corresponded

|  Page 69 | Page 70 |
|---|---|
| 1 with Fortress deciding to loan Uniloc more money. Is<br>2 that fair?<br>3   A. Yes.<br>4   Q. Are you aware of any changes to Fortress'<br>5 security interest in the Uniloc entities' patent<br>6 portfolio that accompanied the amendments to this<br>7 revenue sharing agreement?<br>8   A. I'm not aware of any.<br>9   Q. And did you take any steps to investigate<br>10 whether Fortress' security interest in Uniloc's patent<br>11 portfolio changed when the revenue sharing agreement was<br>12 amended in 2015, 2016 or 2017?<br>13   A. I did not.<br>14   Q. If you go with me to page 281 of this document<br>15 or ending in 281, do you see near the bottom of this<br>16 page there's a list of appendices, schedules and<br>17 exhibits?<br>18   A. Yes.<br>19   Q. Would you take a minute to look at the list of<br>20 schedules, appendices and lists.<br>21   A. Just the list of them?<br>22   Q. Just the list of them.<br>23   A. Okay.<br>24   Q. Have you searched for or taken any steps to<br>25 locate the documents listed on pages 281 and 282? | 1   A. No.<br>2   Q. Were you aware that Apple had requested<br>3 production of these documents and that Judge Alsup had<br>4 ordered that they all be produced?<br>5   A. I was not aware.<br>6       MS. NEFF: Counsel, as of today, Uniloc has<br>7 still not produced all of the documents listed in this<br>8 agreement despite Judge Alsup's order instructing it to<br>9 do so and despite Apple's multiple requests for those<br>10 documents. So Apple will hold this deposition open<br>11 until all such documents are produced, and as we<br>12 informed you on September 19th, Mr. Levy may need to sit<br>13 for a second deposition once Uniloc produces the<br>14 documents the Court ordered it to produce more than a<br>15 week ago.<br>16       MR. FOSTER: So just help me. What documents<br>17 have we not produced?<br>18       MS. NEFF: We can have that discussion after<br>19 the deposition, but I would point to you in part to the<br>20 appendices, schedules and exhibits to the revenue<br>21 sharing agreement, as it is my understanding that as of<br>22 today, not all of those appendices have been produced.<br>23       MR. FOSTER: So you'll have to send me a list<br>24 of what you claim was not produced, and I'll look into<br>25 that, but -- well, I won't say anything further at the |
| Page 71 | Page 72 |
| 1 moment.<br>2       MS. NEFF: Thank you, Counsel.<br>3   Q. Do you see that in the revenue sharing<br>4 agreement we were just looking at, the first appendix<br>5 listed is appendix 1, definitions?<br>6   A. Yes.<br>7   Q. That document we do have.<br>8       (Whereupon, Defendant's Exhibit 1013 was marked<br>9        for identification.)<br>10 BY MS. NEFF:<br>11   Q. I've marked for you as Exhibit 1013 to the<br>12 deposition appendix 1 to the revenue sharing agreement.<br>13       Would you turn with me, please, to the page<br>14 ending in 326. Are you there?<br>15   A. I am.<br>16   Q. Do you see that "patents" means all<br>17 intellectual property of the company, company meaning<br>18 Uniloc Luxembourg, Uniloc Corporation, Uniloc USA and DA<br>19 Investment Holdings?<br>20   A. Yes.<br>21   Q. The parties intended that Fortress' rights as<br>22 described in the revenue sharing and note and warrant<br>23 purchase agreement would attach to all of Uniloc<br>24 Luxembourg, Uniloc Corporation, Uniloc USA and DA<br>25 Investment Holdings' intellectual property, right? | 1   A. Yes, that's what the document says.<br>2       (Whereupon, Defendant's Exhibit 1014 was marked<br>3        for identification.)<br>4 BY MS. NEFF:<br>5   Q. I've handed you our next exhibit.<br>6   A. Thank you.<br>7   Q. You recognize this as the third amendment to<br>8 the revenue sharing and note and warrant purchase<br>9 agreement, correct?<br>10   A. Yes.<br>11   Q. What was the general purpose of this amendment<br>12 from a business perspective?<br>13   A. To provide additional capital to the company.<br>14   Q. This agreement is between Uniloc entities and<br>15 Fortress entities, right?<br>16   A. That's what the document articulates, yeah.<br>17   Q. The Uniloc entities include Uniloc USA, Uniloc<br>18 Luxembourg, Uniloc Corporation and DA Investment<br>19 Holdings, correct?<br>20   A. The document speaks for itself.<br>21   Q. Am I, nevertheless, correct that those Uniloc<br>22 entities are listed as the Uniloc entities that are<br>23 parties to this amendment?<br>24   A. Yes.<br>25   Q. Uniloc USA is referred to as the issuer in this |



Page 77

Q. Are you aware of any instance or period of time where Uniloc USA did not provide regular updates to the purchasers and their advisors?
A. I'm not aware.
Q. Are you aware of any instance where Uniloc USA did not consult with purchasers and their advisors on request?
A. I'm not aware.
Q. Would you read section 6.2.2 aloud for the record, please?
A. "From the closing date through December 31, 2016, the company shall have received at least [redacted] in actual monetization revenue. As of March 31, 2017, and the last day of each fiscal quarter, the company shall have received at least [redacted] in actual monetization revenue during the four fiscal quarter periods ending on such date."
Q. Section 6.2.2 requires the company to receive at least [redacted] in actual monetization revenues from the closing date through December 31st, 2016, right?
A. That's what the document says.
Q. Do you understand what actual monetization revenue is as used in this agreement from a business perspective?

Page 78

A. From a business perspective, yes.
Q. What does "actual monetization revenues" mean as used in this agreement?
A. From a business perspective, a license agreement.
Q. If you go back with me to appendix 1, the definitions --
A. Which document is that?
Q. 1013.
A. Yep.
Q. This appendix defines the term, right?
A. Yes.
Q. It refers to amounts that Uniloc USA or Uniloc Luxembourg actually receives from settlements, royalty payments, judgments or the other payments in relation to the patents held by the Uniloc entities, right?
A. That's what the document says.
Q. Going back to the revenue sharing agreement we were just looking at, the closing date is defined as December 30th of 2014, right?
A. Sorry. December 30th, 2014?
Q. Correct.
A. That's what the document says.
Q. Did the company receive [redacted] between December 30th, 2014, and December 31st, 2016?

Page 79

A. I don't recall.
Q. Who would know?
A. I -- we can go -- you know, we have financial statements for the company, so we can look into it.
Q. So you have financial statements that would document whether the company actually received [redacted], correct?
A. I would assume, yes.
Q. What documents are those that would show whether or not the company received [redacted] in actual monetization revenues in that period?
A. I don't know what specific documents.
Q. What type of documents are those?
A. The year -- the annual -- annual audit.
Q. So if you were looking to answer the question of whether the Uniloc entities hit [redacted] mark, you would look at the annual audit, correct?
A. One of the sources, yes.
Q. What other sources would you look to?
A. Discussions with the company.
Q. Anything else?
A. Not that I'm aware of.
Q. Are you aware of any discussions with the company regarding whether or not the Uniloc entities hit this monetization mark?

Page 80

A. I don't recall those discussions.
Q. Do you know whether or not any such discussions occurred?
A. I don't.
Q. Section 6.2.2 also requires the company to receive [redacted] in actual monetization revenues as of March 31st, 2017, for the four fiscal quarter period ending on that date, right?
A. Yes.
Q. Did the company receive [redacted] for the four fiscal quarter period ending March 31st, 2017?
A. I don't recall.
Q. Did you do anything to determine whether the company met that [redacted] mark for the period ending March 31st, 2017?
A. When?
Q. At any point.
A. No.
Q. Who would know whether the company received at [redacted] for the four fiscal quarter period ending March 31st, 2017?
A. Again, I can look at historical financials and determine if they did.
Q. And those historical financials would be the annual audits of the Uniloc entities; is that correct?

Page 85

1  Q. Okay. So the asset management group at
2  Fortress would have received any of the reports we've
3  been discussing?
4  A. Yes.
5  Q. Would anyone else at Fortress have received
6  those reports?
7  A. No.
8  Q. Are there any instances of which you are aware
9  where the companies should have provided reports under
10 section 6.5.2 but failed to do so?
11 A. I am not aware of any.
12 Q. Section 6.5.2.1 requires a report of actual
13 monetization revenues on the 15th day of every month.
14 Do you see that?
15 A. I do.
16 Q. Who prepared those reports?
17 A. I don't know.
18 Q. Did you do anything as Uniloc 2017's corporate
19 designee to determine who prepared the reports required
20 by the revenue sharing and warrant purchase agreement?
21 A. No.
22 Q. Do you know who at Fortress reviewed the
23 reports we have just been discussing under 6.5.2.1?
24 A. Asset management and general counsel.
25 Q. And who specifically within asset management

Page 86

1  would have reviewed those reports?
2  A. I don't recall who the specific individual was
3  assigned to this deal.
4  Q. Do you have any recollection of any individuals
5  assigned to this deal in the asset management group at
6  Fortress?
7  A. Yeah. Bobby Jarrett runs that group. I'm
8  assuming any kind of anomaly will go up to -- not
9  assume, but any -- any big anomaly will go up to him,
10 and then he would report to me or -- but I don't
11 remember the specific individual that was assigned to
12 this financing.
13 Q. If we go on to section 6.7, do you see that
14 section 6.7 requires, "The company shall not create,
15 incur, assume or otherwise become or remain liable with
16 respect to any indebtedness that is secured by the
17 patents or any rights related thereto"? Did I read that
18 correctly?
19 A. You did.
20 Q. Are you aware of any instances where the
21 company failed to meet its requirements under section
22 6.7?
23 A. I am not aware.
24 Q. Had such events occurred, would you have
25 expected to be made aware?

Page 87

1  A. Yes.
2  Q. If you go to section 6.8, section 6.8 reads, in
3  part, "The company shall not create, incur, assume or
4  suffer to exist any lien upon any patent other than the
5  following," and then lists permitted liens. Section
6  6.8.1, "liens securing the obligations, 6.8.2, the
7  existing licenses and other non-exclusive licenses that
8  are entered into pursuant to the company's monetization
9  activities and otherwise inclines with this agreement."
10 And section 6.8.3, "the lien to Alexander H. Good." Do
11 you see that?
12 A. I do.
13 Q. Are there any instances of which you are aware
14 for the company where the company failed to meet its
15 obligations under section 6.8 of this agreement?
16 A. I am not aware of any.
17 Q. If you go with me to section 6.9.1, do you see
18 that this provision restricts disposition of the patents
19 by the company?
20 A. I do.
21 Q. Are you aware of any instance where the company
22 disposed of patents other than through the methods
23 listed here?
24 A. I am not aware.
25 Q. Are you aware of any breach of section 6.9.1 by

Page 88

1  the company?
2  A. No.
3  MS. NEFF: Let's go off the record to change
4  the tape.
5  THE VIDEOGRAPHER: This marks the end of disk
6  number 1. We're off the record. The time is 11:42 a.m.
7  (Recess taken from 11:42 a.m. to 11:54 a.m.)
8  THE VIDEOGRAPHER: We are back on the record.
9  This marks the beginning of disk number 2 in the
10 deposition of Erez Levy, 30(b)(6) designee of Uniloc
11 2017, LLC. The time is 11:54 a.m.
12 BY MS. NEFF:
13 Q. Mr. Levy, did you have any communications with
14 your counsel during the last break?
15 A. I did not.
16 Q. You still have in front of you the revenue
17 sharing agreement, correct?
18 A. Yes.
19 Q. If you'll go with me to section 7.3 on the page
20 ending 307, do you see that section 7.3 refers to
21 annulment of an event of default, right?
22 A. I'm sorry. I'm not there yet. What page on
23 the bottom right again?
24 Q. 307.
25 A. Yes, I'm with you.