# EXHIBIT U

# JACOBS DECLARATION

# EXHIBIT T

# (REDACTED)

# EXHIBIT S

[DOCUMENT SOUGHT TO BE SEALED]

EXECUTION VERSION

# NOTE PURCHASE AND SECURITY AGREEMENT

This Note Purchase and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of May 3, 2018 (the "Effective Date") by and between Uniloc 2017 LLC, a Delaware limited liability company ("Company"), and CF Uniloc Holdings LLC, a Delaware limited liability company, as the purchaser ("Purchaser") and as the collateral agent (in such capacity, "Collateral Agent"). The parties hereto are sometimes referred to herein as a "Party" or, collectively, as the "Parties".

## RECITALS

WHEREAS, Purchaser is willing, pursuant to the terms and conditions of this Agreement, to purchase (the "Note Purchase") from Company promissory notes in the form attached as Exhibit A (each as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Notes") in an aggregate principal amount of ▮▮▮▮▮▮▮▮ (the "Note Purchase Amount"), upon the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. **DEFINITIONS**.

    1.1 <u>Certain Defined Terms</u>. As used in this Agreement, the following terms shall have the following respective meanings:

    "Affiliate" means with respect to any Person, a Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members; provided, however, that (i) none of Parties or their parent companies or Affiliates shall be deemed to be an Affiliate of any Party or its parent company or Affiliates and (ii) none of Parties or their parent companies or Affiliates shall be deemed to be an Affiliate of Company or any of its Affiliates.

    "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in The City of New York.

    "Change of Control" means at any time, any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act of 1934, as amended) shall have acquired beneficial ownership of more than 50% on a fully diluted basis of the voting and/or economic interest in the equity interests of Company or shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of managers (or similar governing body) of Company.

    "Contingent Obligation" means for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any Indebtedness, lease, dividend, letter of credit or other

CONFIDENTIAL ATTORNEYS' EYES ONLY UNILOC_APPLE_2017_16852

following the receipt of such Net Proceeds, apply an amount equal to 100% of such Net Proceeds to prepay the Outstanding Balance, unless Purchaser shall, in its sole discretion, elect to decline such Net Proceeds in which case they may be retained by Company.

3.6  Mandatory Prepayment upon Issuance of Indebtedness. In the event and on each occasion that, after the Effective Date, Company shall receive Net Proceeds in respect of any issuance or incurrence of any Indebtedness for borrowed money of Company (other than any Permitted Indebtedness), Company shall, immediately upon the receipt of such Net Proceeds, apply an amount equal to 100% of such Net Proceeds to prepay the Outstanding Balance, unless Purchaser shall, in its sole discretion, elect to decline such Net Proceeds, in which case such Net Proceeds may be retained by Company.

3.7  Mandatory Prepayment upon Casualty Events. In the event and on each occasion that, after the Effective Date, Company shall receive Net Proceeds in respect of any Net Insurance/Condemnation Proceeds, Company shall, no later than ten (10) Business Days following the receipt of such Net Proceeds, apply an amount equal to 100% of such Net Proceeds, in excess of such threshold, to prepay the Outstanding Balance, unless Purchaser shall, in its sole discretion, elect to decline such Net Proceeds, in which case such Net Proceeds may be retained by Company.

3.8  Mandatory Prepayment upon Change of Control. In the event that a Change of Control occurs, Company shall immediately repay the Outstanding Balance in full.

3.9  Mandatory Prepayment for Indemnity Claims. In the event and on each occasion that, after the Effective Date, Company shall receive Net Proceeds in respect of any claims for indemnification pursuant to the Purchase Agreement, Company shall, no later than ten (10) Business Days following receipt of such Net Proceeds, apply an amount equal to 100% of such Net Proceeds to prepay the Outstanding Balance, unless Purchaser shall, in its sole discretion, elect to decline such Net Proceeds, in which case such Net Proceeds may be retained by Company.

4.  COLLATERAL.

4.1  Security Interest. This Agreement constitutes a "security agreement" within the meaning of the UCC. In order to secure payment and performance of the Secured Obligations, Company hereby grants, collaterally assigns, and pledges to Collateral Agent, for the benefit of Purchaser, a security interest in and Lien on all of Company's right, title, estate, claim and interest in and to any or all of the items listed on Exhibit B to this Agreement (collectively, the "Collateral").

4.2  Care of Collateral. Collateral Agent shall have the right, but not the obligation, to pay any taxes or levies on or with respect to the Collateral, which payment shall be made for the account of Company and shall constitute part of the Secured Obligations.

4.3  Financing Statements. At the request of Collateral Agent, Company will promptly cooperate with Collateral Agent in filing such financing statements, continuation statements, assignments, certificates and other documents with respect to the Collateral, pursuant to the UCC and otherwise, as Collateral Agent may request in order to enable Collateral Agent to perfect and from time to time to renew the security interest granted, all in form satisfactory to

CONFIDENTIAL ATTORNEYS' EYES ONLY

UNILOC_APPLE_2017_16858

Collateral Agent, and Company will pay the costs of filing the same in all public offices within the United States where Collateral Agent deems necessary or desirable.

    4.4  Impairment of Collateral. No impairment of, injury to, or loss or destruction of any of the Collateral shall relieve Company of any of the Secured Obligations, except as may be specifically provided otherwise herein.

    4.5  Return of Collateral. Upon payment in full of the Notes and any other amounts due hereunder, Collateral Agent shall release its security interest in, and return to Company, all Collateral hereunder.

    4.6  Further Assurances. Company agrees that at any time and from time to time, at its expense, Company will promptly execute and deliver all further instruments and documents, and take all further action that Collateral Agent may request, in order to perfect and protect the security interests granted or purported to be granted hereby and to enable Collateral Agent or Purchaser to exercise and enforce its rights and remedies hereunder with respect to any Collateral within the United States, which instruments and documents shall include, without limitation, any and all necessary or appropriate filings with the U.S. Patent and Trademark Office.

    4.7  Collateral Agent Appointed Attorney-in-Fact. Subject to Section 4.8, Company hereby irrevocably appoints Collateral Agent as Company's attorney-in-fact, with full authority in the place and stead of Company and in its name or otherwise, from time to time in Collateral Agent's discretion and without notice to Company, to take any action and to execute any instrument which Collateral Agent may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including without limitation, to receive, endorse and collect all instruments made payable to Company representing any interest payment, principal payment or other payment in respect of the Collateral or any part thereof and to give full discharge for the same, when and to the extent permitted by this Agreement.

    4.8  Collateral Agent May Perform. Upon the occurrence and during the continuance of an Event of Default, Collateral Agent may exercise the power of attorney granted to it in Section 4.7 to (but shall not be obligated and shall have no liability to any Person for failure to) itself perform, or cause performance of, this Agreement, and the expenses of Collateral Agent incurred in connection therewith shall be payable by Company.

    4.9  Intellectual Property. As to Collateral in the form of intellectual property ("Intellectual Property Collateral"):

      (a)  With respect to each item of the Intellectual Property Collateral, Company agrees to take, at its expense, all necessary steps, including, without limitation, in the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authority within the United States, to (i) maintain the validity and enforceability of such Intellectual Property Collateral and maintain such Intellectual Property Collateral in full force and effect and (ii) pursue the registration and maintenance of each patent, trademark, or copyright registration or application, now or hereafter included in such Intellectual Property Collateral. Company shall not, without the written

8

CONFIDENTIAL ATTORNEYS' EYES ONLY    UNILOC_APPLE_2017_16859

consent of Collateral Agent, discontinue use of or otherwise abandon or fail to pursue the registration or maintenance of any Intellectual Property Collateral.

    (b)    In the event that Company becomes aware that any item of the Intellectual Property Collateral is being infringed or misappropriated by a third party, Company shall promptly notify Collateral Agent and shall take such actions, at its expense, as Company or Collateral Agent deems reasonable and appropriate under the circumstances to protect or enforce such Intellectual Property Collateral, including, without limitation, suing for infringement or misappropriation and for an injunction against such infringement or misappropriation.

    (c)    Company agrees to execute and deliver an agreement, in substantially the form set forth in Exhibit C hereto (an "Intellectual Property Security Agreement"), for recording the security interest granted hereunder to Collateral Agent, for the benefit of Purchaser, in such Intellectual Property Collateral with the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authorities within the United States necessary to perfect the security interest hereunder in such Intellectual Property Collateral.

    (d)    Company agrees that should it obtain an ownership interest in any items that would constitute Intellectual Property Collateral that is not on the date hereof a part of the Intellectual Property Collateral ("After-Acquired Intellectual Property"), (i) the provisions of this Agreement shall automatically apply thereto and (ii) any such After-Acquired Intellectual Property and, in the case of trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual Property Collateral subject to the terms and conditions of this Agreement with respect thereto. Company shall give prompt written notice to Collateral Agent identifying the After-Acquired Intellectual Property, and Company shall execute and deliver to Collateral Agent an Intellectual Property Security Agreement covering such After-Acquired Intellectual Property, which Intellectual Property Security Agreement shall be recorded with the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authorities within the United States necessary to perfect the security interest hereunder in such After-Acquired Intellectual Property.

    **5.**    **REPRESENTATIONS AND WARRANTIES OF COMPANY.** Company hereby represents and warrants to Purchaser as follows:

    5.1    Organization, Good Standing and Qualification. Company is a limited liability company duly organized, validly existing and in good standing under, and by virtue of, the laws of the State of Delaware and has all requisite power and authority to own its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted. Company is qualified to do business in each jurisdiction where failure to be so qualified would have a material adverse effect on its financial condition, business or operations.

    5.2    Subsidiaries. Company does not presently own or control, directly or indirectly, any interest in any other corporation, limited liability company, partnership, trust, joint venture, association or other entity.

CONFIDENTIAL ATTORNEYS' EYES ONLY    UNILOC_APPLE_2017_16860

"Securities Act"), on the grounds that the sale provided for in this Agreement is exempt from registration under the Securities Act, and that the reliance of Company on such exemption is predicated in part on Purchaser's representations set forth in this Agreement. Purchaser understands that the Notes are restricted securities within the meaning of Rule 144 under the Securities Act, and must be held indefinitely unless they are subsequently registered or an exemption from such registration is available.

   6.4 Accredited Investor. Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission.

  7. **COVENANTS**. The following covenants shall apply so long as any Notes remain outstanding:

   7.1 Negative Covenants. Company shall not, without the prior written consent of Purchaser, take any of the following actions:

    (a) create, incur, assume or suffer to exist any Lien on or with respect to any of its assets constituting Collateral, whether now owned or hereafter acquired, except Liens created hereunder in favor of Collateral Agent, for the benefit of Purchaser (collectively, "Permitted Liens");

    (b) create, incur, assume or suffer to exist any debt for borrowed money, except the Notes issued hereunder;

    (c) merge into or consolidate with any Person or permit any Person to merge into it, or enter into transaction which would constitute a liquidation, Change of Control or sale of all or substantially all of the assets of Company;

    (d) sell, lease, transfer or otherwise dispose of all or substantially all of its assets or, without the written consent of Collateral Agent, any of its assets constituting Collateral;

    (e) enter into any transactions with Affiliates, except for (x) transactions entered into on arm's-length terms and (y) the transactions contemplated by the Transaction Documents and any amendments to the Transaction Documents agreed to by the parties thereto;

    (f) amend its certificate of formation or its Operating Agreement; or

    (g) change its name, type of organization, jurisdiction of organization, organizational identification number or location from those as of the Effective Date without first giving at least ten (10) days' prior written notice to Collateral Agent and taking all action required by Collateral Agent for the purpose of perfecting or protecting the security interest granted by this Agreement.

   7.2 Affirmative Covenant. Subject to the provisions set forth in the Operating Agreement, Company shall use its best efforts to pursue any *bona fide* claim (including any claim for indemnification) under the Purchase Agreement in accordance with its terms. Company shall,

11

CONFIDENTIAL ATTORNEYS' EYES ONLY  UNILOC_APPLE_2017_16862